IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Civil No. 1:20CV431 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| $124,000.00 in U.S. CURRENCY, | : | |
| | : | |
| and | : | |
| | : | |
| $6,724.00 in U.S. CURRENCY, | : | |
| Defendants. | : | |

## **VERIFIED COMPLAINT OF FORFEITURE**

NOW COMES Plaintiff, the United States of America, by and through Matthew G.T. Martin, United States Attorney for the Middle District of North Carolina, and respectfully states as follows:

1. This is a civil action *in rem* brought to enforce the provisions of 21 U.S.C. § 881(a)(6) for the forfeiture of the defendant properties, which were furnished or intended to be furnished in exchange for a controlled substance, in violation of the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq.*, or represent proceeds traceable to such an exchange.

2. This action is also brought to enforce the provisions of 18 U.S.C. § 981(a)(1)(C) for the forfeiture of the aforesaid defendant properties which constitute or are derived from proceeds traceable to an offense constituting specified unlawful activity as

defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offense, specifically the exchange of a controlled substance in violation of state and federal law.

3. The defendant currency amounts are $124,000.00 in U.S. Currency and $6,724.00 in U.S. Currency, which were seized on November 13, 2019, in Ramseur, North Carolina, in the Middle District of North Carolina, and are currently in the custody of the United States Marshals Service.

4. Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendant properties. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

5. Venue is proper in this district pursuant to 28 U.S.C. §§ 1355(b)(1) and 1395, because the defendant properties were seized while located in the jurisdiction of this Court, or one or more of the acts giving rise to forfeiture occurred in this district.

6. Upon the filing of this complaint, Plaintiff requests that the Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), which Plaintiff will execute upon the properties pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

7. The facts and circumstances supporting the seizure and forfeiture of the defendant properties are contained in Exhibit A, attached hereto and wholly incorporated herein by reference.

WHEREFORE, the United States of America prays that process of a Warrant for Arrest and Notice *In Rem* be issued for the arrest of the defendant properties; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendant properties be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

This the 14th day of May, 2020.

Respectfully submitted,

MATTHEW G.T. MARTIN
United States Attorney

/s/ Lynne P. Klauer
Lynne P. Klauer
Assistant United States Attorney
NCSB #13815
101 S. Edgeworth Street, 4th Floor
Greensboro, NC 27401
Phone: (336) 333-5351
Email: lynne.klauer@usdoj.gov

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury under the laws of the United States of America, that the contents of the foregoing Complaint are true and correct to the best of my knowledge, information and belief.

Justin B. Trogdon
Task Force Officer
Drug Enforcement Administration

# DECLARATION

I, Justin B. Trogdon, Task Force Officer with the Drug Enforcement Administration (DEA), Greensboro, North Carolina, hereby state pursuant to Title 28, U.S.C. § 1746, under penalty of perjury and pursuant to the laws of the United States, that the following information is true and correct to the best of my knowledge, information and belief:

1. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I have been a Task Force Officer with DEA since April 2019, and I am currently assigned to the DEA, Atlanta Field Division, Greensboro Resident Office. I am also a Deputy Sheriff with the Randolph County Sheriff's Office, currently holding the rank of Sergeant, and have been employed as a law enforcement officer since 2004. In 2005, I was assigned to the Randolph County Sheriff's Office Criminal Investigation Division. My primary responsibilities are to investigate drug violations, murder, robberies, rape, property crimes and other related felonious crimes. In 2009, I was assigned to the Bureau of Alcohol, Tobacco, Firearms, and Explosives, as a Task Force Officer, assigned to the Greensboro Field Office. I worked in that capacity for eight years investigating complex multi-defendant violent crimes, violations of federal firearms laws, and related drug offenses that occurred in the Middle District of North Carolina. I have a Bachelor of Science Degree in Criminal Justice from Western Carolina University. I am currently enrolled at East Carolina University pursuing a Master of Science in Criminal


GOVERNMENT EXHIBIT A

Justice and Administration of Justice. I have received over (2100) hours of law enforcement related training, to include training in the purchasing of drugs/narcotics through various street level operations which involved the use of confidential sources. I have also worked numerous cases in which an undercover officer and/or a confidential source, acting at my direction or in an undercover capacity has purchased illegal substances. I have also attended a Police Law Institute class, which focuses on police search and seizure. I have completed a (40) hour block of instruction in Interview and Interrogation. I am a Field Training Officer for the Randolph County Sheriff's Office, a North Carolina Training and Standards Certified General Instructor, and have been responsible for training new law enforcement officers since February 2010. I have obtained my Advanced Law Enforcement Certificate from the North Carolina Sheriff's Training and Standards Commission. I have participated in hundreds of cases that involved the violation of state and federal laws that govern controlled substances and related crimes. In the time that I have been in Law Enforcement, I have written at least (100) search warrants and participated either directly or indirectly with over (300) search warrants. I have made over (100) drug arrests which resulted in both state and federal prosecutions. I have purchased cocaine hydrochloride, cocaine base also known as crack cocaine, marijuana, heroin, ecstasy, various prescription pills, and methamphetamine "ICE" during these investigations. Because of my training and experience, I am aware of the different types of controlled substances and the way controlled substances are packaged, distributed, and sold. I have also seized U.S. currency as part of these

2

investigations, and I am familiar with how drug proceeds are packaged, concealed, and/or comingled to prevent detection by law enforcement.

2. This declaration is submitted in support of a Verified Complaint of Forfeiture for $130,724.00 in U.S. currency ($124,000.00 and $6,724.00) seized on November 13, 2019, from property belonging to Roger Dean McNeill in Ramseur, North Carolina.

3. Based on the investigation described below, there is probable cause to believe that $130,724.00 in U.S. currency ($124,000.00 and $6,724.00) is subject to forfeiture pursuant to 21 U.S.C. § 881 and 18 U.S.C. § 981.

4. The facts and circumstances set forth in this Declaration are based upon information provided by other law enforcement officers and my own personal knowledge and experience. Since this declaration is being submitted for a limited purpose, I am not including all the facts and information which I have learned about or obtained during the course of this investigation.

5. Vice/Narcotics detectives with the Randolph County Sheriff's Office (RCSO) were conducting an investigation into the sale and distribution of crack cocaine in Ramseur, North Carolina. On November 7, 2019, RCSO detectives used a Confidential Informant (CI) to conduct a controlled purchase of crack cocaine. The CI called a person he knew as "Wint," identified as James Winfred Spinks, who agreed to sell narcotics to the CI. Detectives searched the CI and their car for contraband prior to the controlled purchase, then followed the CI to the buy location of 2226 Dixon Street in Ramseur, North Carolina. Detectives gave the CI money and a recording device to use during the transaction. The CI purchased approximately 0.6 grams of crack cocaine from Spinks at 2226 Dixon Street.

3

6.     On November 8, 2019, Detectives used the CI to make another controlled purchase of crack cocaine from Spinks at 2226 Dixon Street in Ramseur, North Carolina. Detectives initially searched the CI and the CI's car to make sure no contraband was present and then provided the CI with money and a recording device to use during the purchase. Detectives followed the CI to 2226 Dixon Street where the CI met with Spinks, who gave the CI a substance purported to be crack cocaine, which the CI turned over to the detectives afterwards. After this transaction, the CI contacted Spinks by phone again and asserted that Spinks had "shorted him," to which Spinks replied that the CI should come back. Detectives again searched the CI and the CI's car and upon ensuring that no contraband was present, gave him money and a recording device, and followed him back to 2226 Dixon Street in Ramseur, North Carolina. Upon arriving there, the CI walked with Spinks to another residence located at 2004 Craven Street in Ramseur, North Carolina. The CI gave Spinks the money and Spinks then went inside the 2004 Craven residence. Spinks came back outside and gave the CI an additional amount of crack cocaine and a firearm. The CI described an individual identified as Roger Dean McNeill as being present outside 2004 Craven Street while Spinks went into the home, retrieved the firearm, and completed the gun sale with the CI. Furthermore, based on interviews with the CI, detectives know that Spinks was known to "stash" and/or store money, guns, and drugs at 2004 Craven Street.

7.     On November 13, 2019, I and other RCSO officers executed a search warrant on the residences located at 2226 Dixon Street and 2004 Craven Street. Roger Dean McNeill owns both residences. At 2226 Dixon Street, Spinks and others were detained. Officers located $779 in U.S. currency, along with a plastic pill bottle containing a white

4

rock-like substance, two sets of scales, three smoking devices, and a suspected partially smoked marihuana cigarette. Spinks was convicted of felony Sell or Deliver a Schedule II Controlled Substance on September 29, 2011 in Randolph County Superior Court, for which he was sentenced to an active term of 66-89 months of incarceration.

8. I was assigned to the tactical entry team of 2004 Craven Street. Once entry was made into 2004 Craven Street, I went to 2226 Dixon Street. RCSO detectives began processing 2004 Craven Street and discovered a large amount of U.S. currency. I then returned to 2004 Craven Street to assist in the processing of the bulk U.S. currency. MCNEILL was detained within the home and seated in the living room area.

9. At 2004 Craven Street, detectives found (12) bundles of U.S. currency inside a safe that was located in the attic. Each of the 12 bundles was wrapped in aluminum foil and labeled with the amount "$10,000" and the name "Zach". (Based on an obituary for McNeill's mother, who died in April 2020, McNeill appears to have a son or nephew named Zach.)

10. Detectives also found a total of $6,724.00 in U.S. currency in various locations in the master bedroom at 2004 Craven Street. A total of $3,680.00 was found wrapped in aluminum foil under a drawer in a chest of drawers in the master bedroom. $30.00 in U.S. currency was located on top of the chest of drawers. A total of $3,014.00 was located in a blue bag on the floor beside the bed in the master bedroom, including $174.00 in a wallet which was located in the blue bag.

11. At approximately 7:35 a.m., I took possession of the U.S. currency. Officer Lambe and I transported the U.S. currency to the Randolph County Special Operations

5

Division (RCSOD) building in Asheboro, North Carolina. The U.S. currency was transported separate and apart from any drug evidence. The U.S. currency was handled with gloved hands, and it was placed inside plastic evidence bags, then placed inside paper bag for transport.

12. Also, found within the home at 2004 Craven Street, specifically located within the kitchen pantry, was a plastic baggie containing two pill bottles. One bottle contained (40) green in color pills and the other contained (29) blue in color pills. The bottles had no label to indicate whom the prescription pills belonged too, who filled the prescription, and/or which pharmacy filled the prescription. The pills in both bottles were marked as Oxycodone Hydrochloride, both in 15mg dosage units, with the total number being 69 pills, which is a trafficking amount under North Carolina State laws. Multiple firearms were also found in the residence and seized as evidence. A cell phone that McNeill claimed as his was also seized.

13. After arriving at the RCSOD, I requested a narcotics detecting K9 to conduct a "sniff" of the U.S. currency. I set up a "blind" hide for K9 Sergeant Hogan and K9 Bronx by placing the currency in one of three identical paper bags, which were then placed in the bay area of the SOD building near some office workout equipment (specifically a treadmill). Hogan deployed K9 Bronx in the area. TFO Trogdon noted a failed deployment, with no noted alert. TFO Trogdon observed that K9 Bronx would not conduct a sniff on the bags when directed, and simply went to the treadmill. K9 handler Hogan stated that he conducted a training exercise with K9 Bronx a week earlier in the same room, using the treadmill as the location of the hide, and explained that K9 Bronx appeared to be

6

acting from memory and displaying a lack of focus working the "blind hide" as a result of the recent training exercise. After discussing the issue of the "hide" with Hogan, TFO Trogdon made the decision to reset the "blind hide" and utilize a new K9 and handler.

14. At approximately 8:15 am, I reset the "blind hide" using the same materials, but moving the "hide" near a garage bay door inside the RCSOD building. Deputy T. Short and K9 Gunny deployed on the "hide", which yielded a positive alert to the presence of the odor of controlled substances being emitted from the bag that contained the bulk currency. After the hide, the U.S. currency was processed and then placed in the RCSOD secure evidence vault.

15. K9 Gunny is a 2-year-old German shepherd, a breed specifically selected for their keen senses and ability to be trained to detect the odor of controlled substances. K9 Gunny has proved his reliability using his senses to locate narcotic training aids and controlled substances in the field. Under the direction of nationally certified canine trainers, K9 Gunny and his handler Deputy Short successfully completed a 120-hour basic canine handler course at High Point Canine Solutions (HPCS). Under the supervision of HPCS, the handler and his K9 had to successfully complete a written test and a practical field test where it was required to locate unknown hides of cocaine, heroin and methamphetamine. Through his training, K9 Gunny can also detect MDMA or ecstasy. K9 Gunny is trained to sit and stare at the area where he detects the odor of a controlled substance listed above. This behavior is defined as a positive alert or indication. Since being placed into service, K9 Gunny has reliably detected narcotics that have been concealed inside automobiles and inside buildings.

7

16. Deputy Travis Short is employed with the RCSO since 2015 and is currently assigned to the Criminal Interdiction Unit since April 2019. Deputy Short has over five years of law enforcement experience and was previously assigned to the Patrol Division for four years. During his time in law enforcement, he has investigated hundreds of breaking and entering, drug related offenses, larcenies, numerous robberies, sexual offenses, and other related felony violators, and has recovered thousands of dollars' worth of property. These investigations have led to the arrest of many felony violators. Deputy Short has been involved in numerous seizures of controlled substances, and is familiar with the investigations of drug dealers, drug users, and people committing burglaries, larcenies, selling and trading of stolen property and their activities in and around Randolph County. Deputy Short has been a member of the Randolph County Canine Division since May 2019. Deputy Short has a Bachelor of Arts in History from High Point University. Deputy Short's formal law enforcement education consists of hundreds of hours of training relating to criminal investigation and law enforcement techniques. Deputy Short has attended Randolph Community College where he completed his Basic Law Enforcement Training. Deputy Short has completed over (120) hours of training in the area of criminal interdiction including: (42) hours of Comprehensive Roadside Interdiction, (16) hours of Detecting Deception During the Roadside Interview, eight hours of Detecting Fraud During Criminal Interdiction all at Guilford Technical Community College. Deputy Short has attended the Motor Vehicle Criminal Interdiction Association Conference where he completed (32) hours of accredited training in the area of criminal interdiction; attended the Regional Counterdrug Training Academy where he completed (24) hours of training in Commercial

8

Case 1:20-cv-00431 Document 1-1 Filed 05/14/20 Page 8 of 14

Vehicle Interdiction; completed (8) hours of Drug Enforcement for Patrol Officers course at Guilford Technical Community College. Deputy Short attended (40) hours of Field Training Officer course at Guilford Technical Community College; and completed (40) hours of Radar Operator Certification at Guilford Technical Community College. Deputy Short has also completed (120) hours of Canine Handler School under the supervision and direction of nationally certified canine trainers at High Point Canine Solutions. Deputy Short has attended the Handler Instruction and Training Seminar where he completed (24) hours of training in the area of advance canine deployment, detection, handling, and training methods. Deputy Short completed (16) hours of Canine Legal Issues at the North Carolina Justice Academy.

17. On November 13, 2019, following the K9 deployments and processing of the seized currency, I participated in the interview of McNeill with Detectives Sakamura and Santiago. The interview was audio recorded. Detective Sakamura read McNeill his Miranda warnings, which he waived before the interview began.

18. McNeill stated that only three of the guns located in the residence belonged to him, the "little 38, sawed off .410 and a little .22 revolver." McNeill stated that the .410 was his brother's and he inherited it when his brother passed away. McNeill then stated that the other firearms located inside of his house belonged to James Winfred Spinks, AKA "Wint". When McNeill was asked how he knew the other guns belonged to "Wint" he stated that "Wint" would bring items to his residence and go inside the residence while McNeill would go to visit his mother at the nursing home. McNeill stated that the only gun he knew about that was there that did not belong was the gun in the big box that was

under his bed. McNeill stated that he never actually saw "Wint" bring any guns to his house, but he stated that he has seen "Wint" in possession of a firearm while at McNeill's house. McNeill's stated that the firearm "Wint" had possessed was possibly the black revolver.

19. McNeill stated that he "really had no reason" why he gave "Wint" a key to his house. McNeill stated that he never evicted "Wint" and Patricia Spinks because he was afraid of losing tenants to his rental properties. McNeill stated he knows that "Wint" and Patricia were selling "crack", but they never sold anything around him. McNeill denied that he stored narcotics at his residence for "Wint" but stated the pills located in his residence belonged to "Wint". When asked how he knew the pills belonged to "Wint" McNeil stated that "Wint" is the only person who has access to his house. He then stated that "Wint" was seen near the pantry where the pills were located. McNeill stated that he never actually saw "Wint" put anything in the pantry where the pills were located.

20. McNeill was then asked about the money in his residence. McNeill stated that the money found underneath his dresser drawer belonged to "Wint". McNeill stated that there were times that "Wint" would have that drawer out when McNeill would arrive home. When asked why "Wint's" money was packaged in aluminum foil, McNeill stated he had no idea. When asked why the money in the safe that McNeill claimed as his was packaged the same way, he stated that he was informed that if the money had someone's name on it then no one could touch it.

21. McNeill stated that he had told "Wint" to get his "stuff" "out from my house". McNeill stated that he has not seen "Wint" give or sell anything from his house.

10

McNeill says that he has seen people come to his house, but he never saw any transactions. McNeill stated he has never helped "Wint" sell anything, such as drugs, guns etc.

22. When McNeill was asked again why "Wint's" money was packaged the same way his money was. McNeill stated that "Wint" has seen him (McNeill) package his money that way. McNeill was then asked, when did he take his money out from the bank and which bank. McNeill stated that he got the money out of a safety deposit box about three or four years ago. He further stated that the amount of money taken from the safe deposit box was around $90,000.00 and that over the past five years he added money from jobs he has done or money from rental properties to the $90,000.00.

23. McNeill stated he had no knowledge of the pills that were located inside his residence.

24. When asked about documentation for the money, McNeill explained that $68,000.00 came from an insurance claim on a building of his that had burned down. McNeill also stated he has been a self-employed painter for 45 years. McNeill stated he files taxes on all of his money (paint and rental properties). McNeill stated that his wife was his accountant and did all of the book work for all the money he makes.

25. When asked about the rental properties and paying taxes on the money from the rental properties, McNeill stated that he would tell his wife that he would spend money on rental properties and wouldn't have proof that he actually bought or fixed what he told his wife. McNeill stated he would take some of the cash proceeds from the rental property money and put it in with his money he had at the house. McNeill stated his rental properties bring around $4,500.00 to $5,000.00 a month. McNeill then stated that he would take a

11

hundred to five hundred "here or there" and put it towards his money. McNeill added that some of the money came from his painting jobs as well.

26. McNeill stated he banks at Capital Bank in Ramseur (formerly First National). When asked why a narcotics dog would alert on the money seized from his house, McNeill stated he had no idea why.

27. McNeill stated that some of "Wint's" rent money would be in his money located at his house. McNeill also stated that he knows "Wint" doesn't have a job. "Wint" told McNeill he drew disability and Social Security. McNeill asserts that all the money that was in the safe was his.

28. McNeill was asked what he thought "Wint" had kept at his house, specifically talking about the "stuff" he mentioned earlier in the interview. McNeill stated that he believed "Wint" possibly had "crack" in his house. When asked if McNeill knew that "Wint" was a felon, McNeill stated that he had heard "Wint" was a felon but he didn't actually know.

29. McNeill stated his yearly income is around $60,000.00 to $80,000.00. When asked about how much money he made in 2018 McNeill stated that he believes it is possibly around $60,000.00 to $80,000.00. When asked how much money collectively, his painting business and rental properties earned annually, McNeill again stated that he believes it to be around $60,000.00 to $90,000.00. McNeill stated his accountant is someone in Siler City and he couldn't recall her name. When asked to separate the income from painting and rental properties, McNeill stated his income consisted of about $4,000 per month from rental properties and $60,000.00 a year from the painting business. McNeill stated that

12

when he receives money from painting and rental properties the money goes straight to his wife. The interview was concluded at this point.

30. McNeill was charged with felony trafficking in opium or heroin, felony possession with intent to sell and deliver a controlled substance, felony maintaining a vehicle dwelling or place for selling a controlled substance, and felony possession of a weapon of mass destruction. McNeill has no other criminal history.

31. On Thursday, November 14, 2019, I went to the Randolph County Sheriff's Office to take custody of the U.S. currency seized from McNeill. The U.S. currency was collected from RCSO evidence custodian A. Heath, transported directly to DEA, and turned over to Special Agent Dan Kaplan for storage and safekeeping per DEA policy.

32. On Friday, November 15, 2019, the U.S. currency was transported to Loomis for an official count of funds and subsequently transferred electronically to the United States' Marshal Service. The Official count of U.S. currency seized was $130,724.00, which was documented and verified by an official count sheet. Of this amount, $6,724.00 was seized from various locations in McNeill's master bedroom and the remaining balance came from the attic safe.

33. On Friday, November 15, 2019, RCSO Detective Sakamura applied for a search warrant for McNeill's cell phone. A subsequent search of the cell phone revealed what Detective Sakamura knows from his training and experience to be drug conversations with people who are unknown at this point in the investigation. The following are direct quotes from McNeill's phone, which are representative of the respective drug talk: incoming message "you got any of that medicince?" reply "blue pills"; incoming message

"Hey Boo did you u get any pills" reply "football.5s"; incoming message "Hey boo did you get any pain pills yet?" reply "Heyy. No not got none Been feeding mom".

34. DEA adopted the seizure of $130,724.00 in U.S. currency ($124,000.00 and $6,724.00) and began administrative forfeiture proceedings. Notice of the forfeiture proceeding was posted on the internet at www.forfeiture.gov for a period of thirty days commencing on January 27, 2020 and ending on February 25, 2020. On February 14, 2020, DEA received claims to the defendant properties from McNeill. Because claims were filed, the administrative process was terminated and the seizure was referred to the U.S. Attorney's Office for judicial forfeiture.

## CONCLUSION

35. Based upon the foregoing, I am of the opinion that there is probable cause to believe that the $130,724.00 in U.S. currency ($124,000.00 and $6,724.00) was furnished or intended to be furnished in exchange for a controlled substance, or represents proceeds traceable to such an exchange, and is therefore subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(C).

This the 14th day of May, 2020.

Justin B. Trogdon
Task Force Officer
Drug Enforcement Administration